DOUGLAS COUNTY, NEBRASKA, APPELLEE, V. JOSUE ANAYA AND MARY ANAYA, HUSBAND AND WIFE, AS PARENTS OF ROSA ARIEL ANAYA, A MINOR CHILD, APPELLANTS.

694 N.W.2d 601

Filed March 25, 2005. No. S-03-1446.

Amy L. Mattern, of Whitner Law Firm, P.C., L.L.O., for appellants.

Stuart J. Dornan, Douglas County Attorney, Brent Bloom, and Megan Hottman, Senior Certified Law Student, for appellee.

Amy A. Miller for amici curiae American Civil Liberties Union Foundation of Nebraska and Louise and Ray Spiering.

Patrick J. Phipps, of Metcalf, Thompson & Phipps, for amici curiae Children's Healthcare Is a Legal Duty et al.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

The Douglas County District Court ordered Josue Anaya and Mary Anaya to submit their daughter to testing for metabolic diseases as required by Neb. Rev. Stat. § 71-519 (Cum. Supp. 2002).

The Anayas appeal, asserting that § 71-519 violates their rights guaranteed under the 1st and 14th Amendments to the U.S. Constitution and that the issue is moot.

## SCOPE OF REVIEW

 Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 685 N.W.2d 335 (2004). A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Id.*

## FACTS

Rosa Ariel Anaya was born in the Anayas' home, without a physician present, on July 11, 2003. The birth was reported to the Department of Health and Human Services (DHHS) on July 17.

In August 2003, a DHHS employee received Rosa Anaya's birth certificate, checked DHHS' database, and determined that the testing for metabolic diseases required by § 71-519 had not been performed. A certified letter was sent to the Anayas explaining the statute's requirements. Enclosed with the letter was a brochure detailing the screening process, which included drawing a small amount of blood from the heel of the infant to be tested. The Anayas declined to submit Rosa Anaya for the screening, stating that it was in direct conflict with their sincerely held religious beliefs that life is taken from the body if blood is removed from it and that a person's lifespan may be shortened if blood is drawn.

Douglas County brought an action seeking to compel the Anayas to comply with § 71-519. At a hearing on September 26, 2003, Mary Anaya testified as to the Anayas' religious beliefs.

The Anayas subsequently filed a motion for judicial exemption from prosecution and dismissal of the petition. They alleged that it was impossible for them to comply with § 71-519 because 70 days had passed since the birth was registered and DHHS regulations required that the testing be completed within 48 hours of the registration of the birth if the birth was not attended by a physician. They also claimed the statute violated the 14th Amendment to the U.S. Constitution.

The district court found that the State has a compelling state interest in the screening of infants for metabolic diseases and that the Anayas' religious beliefs did not outweigh the State's compelling interest that "these children can grow and develop to be free of a metabolic disease particularly in light of the minimal invasion of the blood test administration which is merely a pinprick to the child's heel." The court rejected the Anayas' claim that the issue was moot due to Rosa Anaya's age. Although testing procedures are most effective when administered shortly after birth, the court found that it was not too late to administer the test even if Rosa Anaya was 6 months of age or older. The court ordered the Anayas to comply with § 71-519 by submitting Rosa Anaya for metabolic screening forthwith.

## ASSIGNMENTS OF ERROR
The Anayas assert that the district court incorrectly held that the State has a compelling interest which outweighs their First Amendment right to free exercise of religion and their fundamental rights as parents. They also assign as error the court's determination that the issue was not moot.

## ANALYSIS
### CONSTITUTIONAL REVIEW
The Anayas argue that § 71-519 infringes upon their First Amendment right to freely exercise their religion and that the district court erred in concluding that the State had shown a compelling interest which justifies the infringement.

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div., Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). The " 'exercise of religion' " involves "not only belief and profession but the performance of (or abstention from) physical acts . . . ." *Smith*, 494 U.S. at 877.

The statute which the Anayas challenged provides:

(1) All infants born in the State of Nebraska shall be screened for phenylketonuria, primary hypothyroidism, biotinidase deficiency, galactosemia,. hemoglobinopathies, medium-chain acyl co-a dehydrogenase (MCAD) deficiency,

and such other metabolic diseases as [DHHS] may from time to time specify. . . .

(2) . . . If a birth is not attended by a physician and the infant does not have a physician, the person registering the birth shall cause such tests to be performed within the period and in the manner prescribed by [DHHS].

§ 71-519. When Rosa Anaya was born, regulations prescribed by DHHS provided that if a birth was not attended by a physician and "the tests have not been performed within 48 hours of birth as otherwise required by these regulations, the person registering the birth must cause newborn screening tests for metabolic diseases to be performed within 48 hours of registration of the birth." 181 Neb. Admin. Code, ch. 2, § 008 (2002).

The Anayas argue that because they have raised a free exercise of religion claim along with a parental substantive due process claim, they have a hybrid constitutional rights claim, which requires strict scrutiny review. Under a strict scrutiny review, the law must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. See *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). The Anayas claim *Smith* held that strict scrutiny is required in cases in which a free exercise claim has been raised along with a claim of violation of another constitutional right.

■ In *Smith*, the claimants ingested peyote during a religious ceremony and were subsequently dismissed from their employment because Oregon law prohibited use of the drug. The question was whether the state's prohibition was permissible under the Free Exercise Clause. In upholding the Oregon law, the Court stated that it had never held that an individual's religious beliefs excused him from compliance with an otherwise valid law prohibiting conduct that a state is free to regulate. "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes . . . conduct that his religion prescribes . . . .' " *Smith*, 494 U.S. at 879, citing *United States v. Lee*, 455 U.S. 252, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982) (Stevens, J., concurring in judgment).

We do not read *Smith* as supporting the Anayas' claim concerning strict scrutiny. Although *Smith* discussed prior decisions that involved not only the Free Exercise Clause but other constitutional provisions, the Court did not hold that a strict scrutiny review is required simply because more than one constitutional right might be implicated.

■ In *Hialeah*, the Court again held that to be found constitutional, a neutral law of general applicability does not require demonstration of a compelling governmental interest. "In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Hialeah*, 508 U.S. at 531.

Federal courts have also discussed hybrid rights claims. In *Swanson By and Through Swanson v. Guthrie ISD I-L*, 135 F.3d 694 (10th Cir. 1998), the federal court addressed an argument that a school policy violated a home-schooled student's free exercise rights and the parents' right to direct her education. The court stated: "[W]e believe that simply raising such a claim is not a talisman that automatically leads to the application of the compelling-interest test." *Id.* at 699. "[I]t cannot be true that a plaintiff can simply invoke the parental rights doctrine, combine it with a claimed free-exercise right, and thereby force the government to demonstrate the presence of a compelling state interest." *Id.* at 700.

In *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999), the court stated, "[W]e recently held that, to assert a hybrid-rights claim, 'a free exercise plaintiff must make out a "colorable claim" that a companion right has been violated—that is, a "fair probability" or a "likelihood," but not a certitude, of success on the merits.' " The court further stated that "a plaintiff does not allege a hybrid-rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right or a claim of an alleged violation of a non-fundamental or non-existent right." *Id.* at 1208. See, also, *Boone v. Boozman*, 217 F. Supp. 2d 938 (E.D.

Ark. 2002) (court found that case did not present hybrid rights theory).

In rejecting the idea of strict scrutiny analysis for hybrid rights claims, the U.S. Court of Appeals for the Sixth Circuit has stated:

> Such an outcome is completely illogical; therefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard than that used in *Smith* to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause.

*Kissinger v. Board of Trustees*, 5 F.3d 177, 180 (6th Cir. 1993).

We conclude that the Anayas' assertion of a hybrid rights claim does not implicate a strict scrutiny review of § 71-519. A party may not force the government to meet the strict scrutiny standard by merely asserting claims of violations of more than one constitutional right.

The second constitutional rights violation asserted by the Anayas seems to suggest that § 71-519 violates their rights as parents to make decisions concerning the upbringing of their children. They rely upon *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972).

In *Pierce*, the Court held that a compulsory education law deprived parents of the right to select a school for their children. It held that the Oregon compulsory education statute "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534-35. The Court concluded that the challenged law served no state interest and therefore had no reasonable relation to any state purpose.

In *Yoder*, the Court held that a state could not compel Amish parents to require their children to attend formal high school and that the compulsory education law violated the 1st and 14th Amendments. The Court noted that no harm to the physical or mental health of the child was inferred but that when the health and safety of a child was involved, different considerations applied.

> To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under

*Prince* [*v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944),] if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

*Yoder*, 406 U.S. at 233-34. The Court did not conclude that strict scrutiny was required.

It is true that "the custody, care and nurture of the child reside first in the parents." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944). However, the Court has never held that parental rights to childrearing as guaranteed under the Due Process Clause of the 14th Amendment must be subjected to a strict scrutiny analysis. See *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). "[T]he Supreme Court has yet to decide whether the right to direct the upbringing and education of one's children is among those fundamental rights whose infringement merits heightened scrutiny." *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533 (1st Cir. 1995). *Pierce* and *Yoder* do not support an inference that parental decisionmaking requires a strict scrutiny analysis.

The question is not whether the Anayas have set forth a hybrid rights claim but whether the law they have challenged is neutral and has general application.

This case is analogous to cases in which courts have upheld the state's right to require immunization of children. In *Boone v. Boozman*, 217 F. Supp. 2d 938 (E.D. Ark. 2002), the court upheld the constitutionality of an immunization statute, finding that the free exercise claim challenged a neutral law of general applicability. The law applied to all school children except those whose health would be endangered by immunization. Because the law was neutral, heightened scrutiny was not required even though compulsory immunization might burden a plaintiff's right to free exercise.

The court stated, "It is well established that the State may enact reasonable regulations to protect the public health and the public safety, and it cannot be questioned that compulsory immunization is a permissible exercise of the State's police power." *Id.* at 954. Society's interest in protecting against the spread of disease takes precedence over parental rights and the right to free exercise of religion. *Id.*

In *Prince*, 321 U.S. at 166-67, the Court held that

neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. . . . [T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and . . . this includes, to some extent, matters of conscience and religious conviction.

■ A law is neutral and of general applicability "if it does not aim to 'infringe upon or restrict practices because of their religious motivation,' and if it does not 'in a selective manner impose burdens only on conduct motivated by religious belief[.]' " *San Jose Christian College v. Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004), quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). Section 71-519 is a neutral law of general applicability. It is generally applicable to all babies born in the state and does not discriminate as to which babies must be tested. Its purpose is not directed at religious practices or beliefs. Pursuant to *Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), and its progeny, a neutral law of general applicability need not be supported by a compelling governmental interest even though it may have an incidental effect of burdening religion.

Section 71-519 does not contain a system of particularized exemptions that allow some children to be excused from testing. See *Kissinger v. Board of Trustees*, 5 F.3d 177 (6th Cir. 1993). The statute does not unlawfully burden the Anayas' right to freely exercise their religion, nor does it unlawfully burden their parental rights. Section 71-519 cannot be construed as directly

regulating religious-based conduct. See *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir. 1991). There is no evidence that the State had an antireligious purpose in enforcing the law. See *id.*

Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court below. *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 685 N.W.2d 335 (2004). A statute is presumed to be constitutional, and all reasonable doubts will be resolved in favor of its constitutionality. *Id.*

We conclude that the effect of § 71-519 upon the constitutional claims the Anayas have asserted is properly analyzed under a rational basis review. Evidence was presented concerning the effects of the diseases that are tested for under the statute. Early diagnosis allows for prevention of death and disability in children. The State has determined that it is appropriate to test for these diseases soon after a child is born in order to address treatment options. The health and safety of the child are of particular concern, as are the potential social burdens created by children who are not identified and treated.

The State has an interest in the health and welfare of all children born in Nebraska, and the purpose of § 71-519 is to protect such health and welfare. This is a rational basis for the law, and it is constitutional.

## MOOTNESS

The Anayas argue that the case is moot because the testing was not performed within 48 hours of Rosa Anaya's birth or within 48 hours after the birth was registered. There is no merit to the Anayas' claim. One cannot refuse to comply with testing required within a particular timeframe and then claim that the case is moot because the time has passed.

Although the value of metabolic screening may decline as the child ages, the test results can prove helpful in preventing death or retardation later in development. The program manager for DHHS' newborn screening program testified that some of the conditions occur rapidly after birth and others occur later in childhood. Early diagnosis allows for prevention of death and disability in newborns and children. If a child is not born in a hospital

and the testing is conducted outside the 48-hour timeframe, some of the benefit of treatment is reduced, but further damage can be prevented. It is not possible to determine if a child has any of these conditions by the appearance of the child.

A medical doctor testified concerning the diseases identified in § 71-519. Phenylketonuria, referred to as "PKU," is an inherited metabolic condition due to a genetic absence of an enzyme. The condition creates an abnormal buildup of amino acid that interferes with the growth of nerve cells in the brain, which is critical in the very first weeks and months of an infant's life. Abnormal chemistry is present and can be diagnosed within hours of birth. Any damage occurs within the first few weeks of life, but clear evidence may not be seen until the second half of the first year. Treatment is a special diet that allows children to develop normally.

Hypothyroidism results in a loss of thyroid function and in newborns causes the brain not to develop, resulting in profound mental retardation and developmental delays. An infant with hypothyroidism would not grow well, and the condition would be obvious within a few weeks of birth.

Galactosemia is a condition due to a missing enzyme. Babies without the enzyme quickly become jaundiced and droopy, and they may have a bloodstream infection that kills them within days.

Biotinidase is an enzyme that helps to conserve a B vitamin. A person who lacks the enzyme can develop acidosis, blindness, mental retardation, seizures, and deafness. Treatment is inexpensive and inoffensive. Signs and symptoms of this disease do not manifest early or at a predictable time. A child who is deficient in biotinidase will probably become symptomatic during the first year, and a child who is partially deficient might become symptomatic during childhood or adolescence.

Hemoglobinopathies can result in diseases including thalassemia and sickle cell disease, which are readily diagnosable and at least partially correctable. Newborns with these diseases are susceptible to bloodstream infections during the first year of life. Symptoms include a low blood count and sometimes an enlarged spleen, which would generally be assessed by a physician.

MCAD, medium chain acyl-CoA dehydrogenase deficiency, is due to the absence of an enzyme that is responsible for burning

body fat. MCAD may appear in the first few days or weeks of life or during a childhood illness with fever and vomiting. It can be seen in school-age children. Remedial measures include educating the parents and the child's physician as to the condition and the risks and giving the child a dietary supplement. An episode of severe flu-like symptoms can result in brain damage.

▮ A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). A case becomes moot when the issues initially presented in litigation cease to exist or the litigants lack a legally cognizable interest in the outcome of litigation. *Krajicek v. Gale*, 267 Neb. 623, 677 N.W.2d 488 (2004).

The issue of whether metabolic screening can be required pursuant to state law is not moot. Were we to determine that the issue of testing is moot because testing has not been completed in the case at bar, we would create a loophole allowing parents to avoid compliance with § 71-519.

The testimony of expert witnesses demonstrated that there is value in testing a child even beyond the 48-hour period immediately after birth. Although some of the conditions would have already manifested themselves, others can develop later in life.

In our review of a question of law, this court has an obligation to resolve the question independently of the conclusion reached by the trial court. See *Blue Cross and Blue Shield v. Dailey*, 268 Neb. 733, 687 N.W.2d 689 (2004). The record demonstrates that even if metabolic screening is completed beyond the first 48 hours of life, it is still important for the health and welfare of the child. Steps can be taken to treat any condition detected. The district court was correct in finding that the issue is not moot.

## CONCLUSION
The judgment of the district court is affirmed.

AFFIRMED.